HCA HEALTH SERVICES OF GEORGIA, INC., Plaintiff-Appellant,

v.

EMPLOYERS HEALTH INSURANCE COMPANY, Defendant-Appellee.

No. 99-11241.

United States Court of Appeals,

Eleventh Circuit.

Feb. 2, 2001.

Appeal from the United States District Court for the Northern District of Georgia. (No. 96-03333-1-CV-CAM), Charles A. Moye, Jr., Judge.

Before TJOFLAT, MARCUS and KRAVITCH, Circuit Judges.

TJOFLAT, Circuit Judge:

This is an ERISA[1] case involving the denial of benefits allegedly due a patient under the terms of a group health insurance policy issued and administered by an insurance company. The patient underwent covered outpatient surgery at a medical center. At the time of surgery, the patient assigned to the medical center his right to recover 80% of the costs of the surgery from the insurance company.[2] Accordingly, the medical center billed the insurance company for the costs of the surgery. Although the amount of the bill was consonant with the usual and customary fee charged for such services, the insurance company reduced the bill by 25% and paid the medical center 80% of the reduced bill. The insurance company claims it was entitled to reduce the medical center's bill by virtue of the following series of contracts: the medical center promised a third party that it would charge a discounted fee upon rendering specified medical services; the third party, in turn, "leased" the right to the discounted fee to a fourth party; then, unbeknownst to the patient and the medical center, the fourth party "leased" the right to the discounted fee to the insurance company.

The medical center demanded full payment of its bill and the insurance company refused. The

---

[1] This cases arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et. seq.

[2] While the patient is ultimately responsible for the bill, under his health insurance policy, the insurance company agreed to pay a percentage of a provider's bill. The terms of the insurance policy dictated that the insurance company would pay 80% of a provider's fee for covered medical service, such as the medical center's fee, and the patient would pay 20% of the fee. Aware of this arrangement between the insurance company and the patient, the medical center in this case billed the insurance company for the entire amount. As patient's assignee, the medical center is entitled to demand that the insurance company fulfill its contractual obligation to the patient. Upon receiving a percentage of the bill from the insurance company, the medical center would then balance bill the patient for the remainder of the bill.

medical center then brought this lawsuit on behalf of its assignee, the patient, seeking recovery of benefits due the patient under the terms of his health insurance policy.[3] On cross motions for summary judgment, the district court granted the medical center the relief it sought, entering judgment for 80% of the full amount of the medical center's bill for services.[4] The insurance company now appeals that judgment. We affirm.

## I.

## A.

The complex relationships among the multiple actors in this case necessitates a brief "who's who." Software Builders, Inc. ("Software Builders")[5] is the employer of the patient, Steven J. Denton ("Denton") and sponsor of the welfare benefit plan[6] it purchased for its employees from the insurance company, Employers Health, Inc. ("EHI"). EHI[7] is the insurance company whose interpretation of the welfare benefit plan purchased by Software Builders is at issue in this case. Denton,[8] a plan participant in the welfare benefit plan sponsored by Software Builders and administered by EHI, is the patient who underwent outpatient surgery performed by the medical center, HCA Health Services of Atlanta, d/b/a Parkway Medical Center

---

[3]The medical center brought the suit in Georgia Superior Court, seeking recovery under four state law theories: breach of contract, quantum meruit, open account, and stated account. The insurance company removed the case to the United States District Court for the Northern District of Georgia on the ground that the medical center's claims "related to" an employee welfare benefit plan governed by ERISA. Subsequent to the removal, the medical center amended its complaint to seek alternative relief pursuant to 29 U.S.C. § 1132(a)(1)(B).

[4]The district court granted the insurance company's motion for summary judgment as to the medical center's state law claims. After granting the medical center's motion for summary judgment as to the medical center's ERISA claim, the insurance company moved the district court to alter or amend the judgment. The district court denied this motion.

[5]Software Builders, a software company located in Duluth, Georgia, is an employer within the meaning of 29 U.S.C. § 1002(5).

[6]The group health insurance policy Software Builders purchased from EHI constitutes an employee benefit plan within the meaning of ERISA. Under ERISA, the term "employee benefit plan" includes an "employee welfare benefit plan and/or an 'employee pension benefit plan.' " 29 U.S.C. § 1002(3). An "employee welfare benefit plan" is a plan, fund or program established or maintained by an employer for the purposes of providing certain benefits, such as medical benefits to participants and beneficiaries. 29 U.S.C. § 1002(1). Because the group health insurance policy issued by EHI and sponsored by Software Builders relates to medical benefits, it is considered a welfare benefit plan under ERISA.

[7]EHI, a wholly owned subsidiary of Humana, Inc., is a plan administrator as defined by 29 U.S.C. § 1002(16)(A)(i). In the group insurance policy it issued to Software Builders, EHI is listed as both the administrator and insurer of the plan.

[8]Denton is a plan participant within the meaning of 29 U.S.C. § 1002(7).

("Parkway"). Parkway is the medical center that performed the surgery at issue in this case, the assignee of Denton's claim against EHI, and party to a preferred provider network contract with MedView Services, Inc. ("MedView"). MedView is an entity that contracts with providers such as Parkway to form a preferred provider network which MedView then markets to third party payors, usually insurance companies. In its contract with MedView, Parkway agreed to accept seventy-five percent of its usual and customary fee when providing specified medical services to MedView Subscribers.[9] MedView leased[10] its preferred provider network to Health Strategies, Inc. ("HSI").[11] HSI is both a manager of provider networks (like MedView) and a vendor of provider discounts. As a vendor, it leases its networks (both the networks it forms on its own and the networks it leases from entities such as MedView) to insurance companies so that they may access the discounts that providers promised to accept as payment in full when they joined the network. HSI leased to EHI the right to access the discounts in HSI's provider networks, including the network leased from MedView (which included Parkway as a provider), in return for a percentage of the savings EHI gained from availing itself of the discounted fees promised by providers who were members of the networks.

B.

On March 31, 1995, Software Builders applied to EHI for a group health insurance policy providing medical, surgical, and hospital care for Software Builders' employees. Coverage under the policy became effective April 1, 1995, and a welfare benefit plan within the meaning of 29 U.S.C. § 1002(1) was established. In its contract with EHI, Software Builders elected to provide its employees with the Preferred Provider Organization ("PPO") form of managed care. Typically, the PPO form of managed care operates as follows: health care providers, such as doctors and hospitals, form a network of providers either on their own or by contracting with a third-party entity created for the purpose of forming provider networks. This third-party

---

[9]This term of art in the Parkway/MedView contract is discussed *supra* Part VII.A.2.b. In short, it means a "a person who, by virtue of a binding contract between MedView and any business entity, may obtain medical and/or surgical services of Preferred Hospitals."

[10]In this context, leasing means the lessor will provide the lessee with access to the provider discounts the lessor has procured. In return for access, the lessor will receive a percentage of the gain or savings the lessee earns by virtue of using the provider discounts. For example, MedView leased to HSI Parkway's promise to accept 75% of its usual and customary fee. When HSI avails itself of Parkway's discounted fee, it saves an amount equal to 25% of the usual and customary fee. HSI then pays MedView 20% of this savings.

[11]Health Strategies, Inc. later changed its name to Healthcare Synergies, Inc. The abbreviation "HSI" will be used throughout to refer to the corporate entity under either name.

entity acts as a middleman between the providers in the network and third party payors such as insurance companies. In this case, Parkway, a provider, contracted with MedView, a middleman to become part of MedView's preferred provider network.

In essence, a PPO is a network of health care providers organized to offer medical services at discounted rates. The PPO providers furnish their services at discounted rates because they expect to receive a higher volume of patients, i.e., participants in the welfare benefit plan offered by the insurance company. The increase in the volume of patients is a result of third party payors, who pay the bills for medical services plan participants receive, directing plan participants to providers in the PPO network through marketing materials and financial incentives. Because third party payors, such as insurance companies, are financially responsible for the costs of a plan participant's covered medical care, it is in the third party payor's best interest for the plan participant to receive medical care from a provider who has promised to accept a discounted fee. The use of financial incentives and other measures to direct plan participants to providers in the PPO is known in the health care industry as "steerage."

Another component of the PPO form of managed care rests on the difference between "in-network" and "out-of-network" providers. Under the PPO form of managed care, providers in the network of health care providers who offer a payor discounted rates are often referred to as "in-network" providers. Conversely, providers who do not agree to offer the payor discounted rates are referred to as "out-of-network" providers.

In this case, EHI agreed to treat the providers in Private Health Care Systems ("PHCS") as its in-network providers (also known as "preferred providers") in return for PHCS members' promises to discount their fees when providing medical services to EHI's plan participants. Thus, when EHI contracted with Software Builders to offer a PPO form of managed care to Software Builders' employees, the providers in PHCS became the in-network providers for Software Builders' employees.

What makes PPOs attractive relative to some other forms of managed care is that a percentage of the bill for the plan participant's health care is still covered by the insurance company if the plan participant chooses to receive covered medical services from an out-of-network provider.[12] Given in-network providers'

_____

[12]Like health maintenance organizations ("HMOs"), PPOs are comprised of networks of physicians and hospitals that have agreed to discount their rates for plan participants. Unlike HMOs, PPOs typically do not use a primary care physician to oversee the patient's medical care. As such, plan participants may consult specialists or out-of-network providers whenever they feel it is necessary. Plan participants are strongly encouraged to seek the services of in-network providers. If they do not, they will pay more in that their insurance company pays a lower percentage of the provider's bill.

promise to discount their fees, however, it is in the best interest of the third party payor to steer plan participants to in-network providers. Because Software Builders opted for the PPO form of managed care, EHI's financial obligations differ depending on whether Software Builders' employees such as Denton use the services of PHCS providers. Therefore, EHI steers plan participants to its in-network providers, i.e., members of PHCS, through financial incentives.

For instance, EHI states that if a plan participant receives medical care from an in-network provider (a member of PHCS), then EHI will pay 90% of the cost of service and the participant will pay 10%. If the plan participant receives medical care from an out-of-network provider, then EHI will pay 80% of the cost of medical service and the participant will pay 20%. In addition to the incentives created by the 10/20% co-payment differential, EHI fulfills its obligation to steer participants to PHCS by marketing the services of PHCS providers by supplying plan participants with a directory of the providers in the PHCS network. Similarly, EHI identifies PHCS as the network of preferred providers on the plan participants' insurance cards and provides a phone number for participants to confirm the identity of PHCS providers.[13] Finally, in the participant's Certificate of Insurance ("COI"), EHI explains the

> *Reasons to Use a PPO Provider.* 1. We [EHI] negotiate fees for medical services. The negotiated fees lower costs to You [Participants] when You use ... providers in the PPO. 2. In addition, You may receive a better benefit and Your Out-Of-Pocket expenses will be minimized. 3. You will have a wide variety of selected ... providers in the PPO to help YOU with Your medical care needs. In order to avoid reduced benefit payments, obtain Your medical care from Preferred Providers whenever possible. However, the choice is Yours.

As explained above, providers may either form their own network and then sell their services to insurance companies, or they can work through middlemen, such as MedView or HSI. In this case, Parkway agreed to become part of MedView's network of providers so that MedView could act as middleman between Parkway and third party payors like insurance companies to establish the insurance company/in-network provider type of relationship described above. HSI formed its networks of providers either on its own or by leasing existing provider networks. Instead of marketing its networks to insurance companies to be treated as in-network providers, HSI acts as a vendor, leasing provider discounts to insurance companies.[14] As part of providing third party payors with access to provider discounts, HSI performs the administrative task of

---

[13]EHI's contract with PHCS prohibited EHI from marketing any other PPO network in the Duluth, Georgia market.

[14]These contracts are discussed more fully in Part II.B.1-3.

repricing provider invoices to reflect the discounted rate.[15]  In this case, MedView leased its network of providers (including Parkway) to HSI. HSI leased to EHI the use of the provider discounts in its networks, including that network leased from MedView.

## II.

## A.

Given this brief explanation of the pertinent participants and the PPO form of managed care, we turn to the events giving rise to this lawsuit.  On December 6, 1995, Denton elected to undergo outpatient surgery at Parkway.[16]  Since Parkway was not a member of EHI's preferred provider network, PHCS, Parkway was considered an out-of-network provider under the terms of plan issued by EHI to Software Builders.  As such, EHI covered 80% of the cost of medical service and Denton was responsible for the remaining 20%.  Denton executed an Assignment of Insurance Benefits in favor of Parkway authorizing EHI to pay his insurance benefits directly to Parkway.  Seeking payment for Denton's surgery, Parkway invoiced EHI in the amount of $3,108.00 for services rendered.  On December 22, 1995, EHI's claims department received the Parkway invoice.  EHI referred the invoice to HSI for repricing.  HSI recalculated the invoice to reflect the discounted fee Parkway had promised to MedView.  On January 25, 1996, EHI processed the claim and sent Parkway an Explanation of Remittance along with payment in the amount of $1,864.80.

The Explanation of Remittance reflected an "amount charged," an "amount allowed," and an "amount paid."  The Explanation of Remittance indicated that EHI applied a 25% discount ($777.00) to the amount charged ($3,108.00) to arrive at the amount allowed ($2,331.00).[17]  EHI paid 80% (the out-of-network percentage) of the amount allowed to arrive at the amount paid ($1,864.80).  In a footnote on the back of the Explanation of Remittance, EHI stated that "[p]ayment is based on a PPO contract with the HSI network, MedView Services, Inc. or their affiliates."  According to EHI, Denton's co-payment obligation was 20% of the adjusted bill ($466.20).

---

[15]When EHI receives an invoice from an out-of-network provider, it refers the invoice to HSI and other vendors with whom it has a similar relationship.  HSI then recalculates the provider's bill to reflect the discounted fee.  HSI returns the revised invoice to EHI who remits to the provider 80% of the discounted fee.

[16]Parkway performed a hernia operation on Denton.

[17]EHI claims it was allowed to reduce Parkway's fee by 25% based on the series of contracts discussed *infra* Part II.B.1-3.

B.

EHI interprets its plan to mean that due to a series of contracts, it only has to pay Denton's assignee 80% of a discounted fee rather than 80% of the amount charged. EHI's plan interpretation involves two distinct but related components. First, EHI claims it is entitled to a 25% discount of Parkway's bill of $3,108.00 based on a series of contracts that indirectly create contractual obligations between EHI and Parkway. The contracts in this series, the Parkway/MedView contract, the MedView/HSI contract, and the HSI/EHI contract, are discussed below. The second component of EHI's plan interpretation relates to the contract between EHI and Denton in which EHI promised to pay 80% of an out-of-network provider's fee for covered medical services. EHI claims that because it's participants have the right to be charged the discounted fee by Parkway, it only owes Parkway 80% of the discounted fee rather than 80% of the amount charged. In short, EHI uses its interpretation of its rights and obligations under the series of contracts to interpret its rights and obligations under the terms of its contract with Denton. According to EHI, the result of its interpretation is that EHI and Denton pay 80% and 20% respectively of Parkway's discounted fee. The following is a brief explanation of each contract in the series of contracts.

1.

The Parkway/MedView contract was formed on March 18, 1994, when Parkway entered into a Preferred Hospital Agreement with MedView. By virtue of this agreement, Parkway became a preferred provider in the MedView PPO network. In return for this preferred status, Parkway agreed to accept 75% of its usual and customary fee for specified outpatient services as payment in full.

2.

The MedView/HSI contract was formed on April 14, 1994, when MedView entered into a Letter of Agreement with HSI. The MedView/HSI contract stated that MedView "may enter into contractual arrangements with health care providers for the purpose of arranging for the delivery of health care services at a reduced fee, and will provide other services for [HSI]." The contract makes clear that HSI "desires to obtain the advantage of the reduced fees available through the preferred provider network by 'leasing' MedView's network of providers." "Leasing" means "the Company [HSI] will perform all repricing functions to adjust fees from charges to contracted rates." Among other duties, HSI agreed to "expeditiously reprice

fees for provider services to amounts contracted by MedView."[18]  According to EHI, the MedView/HSI contract allowed HSI to pass on to HSI's clients the provider discounts that MedView obtained from its own network of providers.

3.

The HSI/EHI contract is the final link in the series of contracts that allegedly entitles EHI to base the percentage it owes Parkway on the discounted fee referenced in the Parkway/MedView contract rather than on the fee charged by Parkway in its invoice. The HSI/EHI contract was formed on July 18, 1995, when EHI and HSI entered into the PPO Network Customary Participation Agreement. According to EHI, HSI is "a company which develops networks of participating health care providers, such as hospitals which agree to accept discounted payments from insurance companies and other payors. HSI [then] enters into contracts with network providers and with payors, including [EHI]." Under the terms of the HSI/EHI contract, HSI agreed to reprice bills that EHI received from HSI's network of providers (including MedView providers) for services rendered to participants in EHI's health insurance plan. EHI refers to the discounts it received by virtue of its contract with HSI as its "shared savings" agreement. Under the shared savings agreement, providers receive expedited payment for their services in return for the discounted fees.

EHI explains that when it received Parkway's invoice for the services performed on Denton, it sent the invoice to HSI. HSI, by virtue of its contract with MedView, repriced the bill to reflect the discount Parkway promised to MedView. Meanwhile, Parkway hired Network Analysis, Inc. ("Network Analysis") to detect and eliminate the practice of unauthorized discounts. EHI contends that months after the January 25, 1996 Explanation of Remittance, Network Analysis noticed that Parkway received $777.00 less from EHI than the amount charged. Parkway sent letters to EHI dated August 6, 22, and 27, 1996 contesting the discount. In each of the three letters, Parkway stated that it found EHI's use of the discount inappropriate and requested that EHI remit $777.00. Each letter identified Denton as the insured and referenced the claim number, the patient number, the date of service, the amount of the allegedly improper discount, and the treating facility. In its response of August 30, 1996, EHI asserted it was entitled to the discount and explained that it had "forwarded the cases in question and your letters to HSI for eligibility confirmation." Parkway

---

[18]Although at oral argument we learned that Parkway has not sought redress against MedView, we note that the MedView/HSI agreement does not require HSI to secure payors who will steer patients to MedView providers. We note also that the Parkway/MedView contract contains an anti-assignment provision.

received no further correspondence from EHI. On November 8, 1996, Parkway, as assignee of Denton, brought this suit for recovery of benefits allegedly due under the group health insurance policy between Software Builders and EHI.

## III.

The district court's grant of summary judgment is subject to plenary review. *Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1449 (11th Cir.1997). Summary judgment shall be granted where the moving party has shown that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We construe the facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1454 (11th Cir.1998).

## IV.

According to EHI, Parkway lacks standing to bring this suit. EHI contends that Denton was not harmed by its plan interpretation because Parkway never balance billed Denton for the remaining $777.00, i.e., 25% of the amount charged—$3,108.00. Instead, EHI's plan interpretation benefitted Denton because it lowered his co-payment. Because he was not harmed, Denton lacks standing to bring this action himself; thus, his assignee, Parkway, also lacks standing.[19]

Under 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary of an employee benefit plan may initiate civil proceedings to recover benefits under the terms of the plan. Parkway is Denton's assignee and in *Cagle v. Bruner,* 112 F.3d 1510, 1515 (11th Cir.1997), we explained that "neither 1132(a) nor any other ERISA provision prevents derivative standing based upon an assignment of rights from an entity listed in that subsection." In *Cagle,* we rejected the same argument EHI is making in this case in favor of allowing provider-assignee standing in suits for the recovery of benefits under ERISA. We explained:

[i]f provider-assignees cannot sue the ERISA plan for payment, they will bill the participant or

---

[19]We reject EHI's contention that *Jones v. New York Life Ins. Co.,* No. 95 CIV. 10825(LLS) (S.D.N.Y. July 11, 1997), applies to this case because *Jones* does not address provider-assignee standing under ERISA. Furthermore, the language from our opinion in *Cagle v. Bruner,* 112 F.3d 1510, 1515 (11th Cir.1997) quoted *infra* implies that a provider does not have to balance bill a patient in order to have derivative standing. Consider the use of the future tense in our statement that "[i]f provider-assignees cannot sue the ERISA plan for payment, they *will bill* the participant or beneficiary directly." *Cagle,* 112 F.3d at 1515 (emphasis added). EHI's argument is inconsistent with our rationale in *Cagle.* One of our reasons for allowing provider-assignees derivative standing is so that providers will not balance bill participants, thereby requiring participants to bring suit against their insurance company for unpaid benefits. Given our reasoning in *Cagle,* we reject EHI's argument that Parkway needed to balance bill Denton in order to have standing.

beneficiary directly for the insured's medical bills, and the participant or beneficiary will be required to bring suit against the benefit plan when claims go unpaid. On the other hand, if provider-assignees can sue for payment of benefits, an assignment will transfer the burden of bringing suit from plan participants and beneficiaries to "providers [, who] are better situated and financed to pursue an action for benefits owed for their services."

*Id.* at 1515 (alteration in original) (internal citation omitted). Given our reasoning in *Cagle,* we conclude that Parkway, as a provider-assignee, has standing to sue for the recovery of benefits under the group insurance plan at issue in this case.

V.

EHI also claims that it was entitled to summary judgment because Parkway failed to exhaust its administrative remedies prior to bringing this suit. "It is well-established law in this circuit that plaintiffs in ERISA cases must normally exhaust available administrative remedies under their ERISA-governed plans before they may bring suit in federal court." *Springer v. Wal-Mart Associates' Group Health Plan,* 908 F.2d 897, 899 (11th Cir.1990). EHI cites the following provision of the COI to demonstrate that Parkway's claim is not timely:

> If We partially or fully deny a claim for benefits submitted by YOU, and YOU disagree or do not understand the reasons for this denial, You may appeal this decision. Your appeal must be submitted in writing within 60 days of receiving written notice of denial. We will review all information and send written notification within 60 days of Your request.

According to EHI, Parkway did not appeal the alleged denial of benefits within 60 days of receiving the Explanation of Remittance from EHI. Parkway contends that the Explanation of Remittance did not constitute a written notice of denial. We agree. The above quoted language makes clear that the participant must appeal "within 60 days of receiving *written notice of denial* " (emphasis added). Although EHI's Explanation of Remittance indicated that the claim was discounted, it failed to explain the manner by which EHI adjusted the claim. The footnote on the back of the Explanation of Remittance stating "[p]ayment is based on a PPO contract with the HSI network, MedView Services, Inc. or their affiliates" does not contain sufficient information to constitute a "written notice of denial."

Further, we accept the finding of the district court that Parkway's letters dated August 6, 22, and 27, 1996, initiated the administrative review process. *See Springer,* 908 F.2d at 899 (stating that "the decision whether to apply the exhaustion requirement is committed to the district court's sound discretion") (quoting *Curry v. Contract Fabricators Inc. Profit Sharing Plan,* 891 F.2d 842, 846 (11th Cir.1990)). Parkway argues that EHI's August 30, 1996 letter stating that it believed the discount was correct but that it had forwarded the letters "to HSI for eligibility confirmation" demonstrates that EHI understood it was taking part in the

appeals process. Again, we agree that EHI's failure to respond further within the required sixty-day time frame was an implicit denial of the appeal. As such, the entry of summary judgment against Parkway on its ERISA claim would have been inappropriate on the ground that Parkway failed to exhaust its administrative remedies before filing suit.

## VI.

In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court stated that, generally, courts should review claims challenging an ERISA claims administrator's[20] denial of benefits under a *de novo* standard. The Court adopted the *de novo* standard because the arbitrary and capricious, or abuse of discretion, standard,[21] is too lenient. The Court explained that the arbitrary and capricious standard of review is appropriate, however, when the plan documents at issue explicitly grant the claims administrator discretion to determine eligibility or construe terms of the plan. *See id.* at 115, 109 S.Ct. at 954-56; *see also Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield,* 41 F.3d 1476, 1481 (11th Cir.1995). The arbitrary and capricious deference is diminished though, if the claims administrator was acting under a conflict of interest. *Florence Nightingale,* 41 F.3d at 1481. If the claims administrator was acting under a conflict of interest, "the burden shifts to the [administrator] to prove that its interpretation of the plan provisions committed to its discretion was not tainted by self interest." *Brown v. Blue Cross & Blue Shield,* 898 F.2d 1556, 1566 (11th Cir.1990). "Accordingly, this court has adopted the following standards for reviewing administrators' plan interpretations: (1) *de novo* where the plan does not grant the administrator discretion[;] (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." *Buckley v. Metropolitan Life,* 115 F.3d 936, 939 (11th Cir.1997). We hold that heightened arbitrary and capricious review is the appropriate standard because EHI suffers from a conflict of interest.[22]

In reviewing a claims administrator's benefits determination, the court follows a series of steps. The applicability of heightened arbitrary and capricious review is a result of the court making a specific

---

[20]"The distinction between a plan administrator and a fiduciary is unimportant because the standard of review, as set forth by the Court in *Firestone,* 'applies equally to the decision of fiduciaries and the plan administrator.' " *Marecek v. BellSouth Telecommunications, Inc.,* 49 F.3d 702, 705 n. 1 (11th Cir.1995).

[21]*See Jett v. Blue Cross & Blue Shield,* 890 F.2d 1137, 1139 (11th Cir.1989) (stating that the arbitrary and capricious standard is used interchangeably with an abuse of discretion standard).

[22]*See supra* Part VII.A.5.

determination at each step in the analysis. At each step, the court makes a determination that results in either the progression to the next step or the end of the inquiry. For ease of application, we lay out these steps below and then apply them in Part VII to the instant case.

First, a court looks to the plan documents to determine whether the plan documents grant the claims administrator discretion to interpret disputed terms. If the court finds that the documents grant the claims administrator discretion, then at a minimum, the court applies arbitrary and capricious review and possibly heightened arbitrary and capricious review.

Regardless of whether arbitrary and capricious or heightened arbitrary and capricious review applies, the court evaluates the claims administrator's interpretation of the plan to determine whether it is "wrong."[23] *See Godfrey v. BellSouth Telecommunications, Inc.,* 89 F.3d 755, 758 (11th Cir.1996) ("we first conduct a *de novo* review to decide if the [claims administrator's] determination was wrong."); *Brown,* 898 F.2d at 1566 n. 12 ("[i]t is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary."); *see also Marecek v. BellSouth Telecommunications, Inc.,* 49 F.3d 702, 705 (11th Cir.1995) (explaining that when the district court agrees with the ultimate decision of the administrator, it will not decide whether a conflict exists. Only when the court disagrees with the decision does it look for a conflict and, when it finds such a conflict, it reconsiders the decision in light of this conflict).

If the court determines that the claims administrator's interpretation is "wrong," the court then proceeds to decide whether "the claimant has proposed a 'reasonable' interpretation of the plan." *Lee v. Blue Cross/Blue Shield,* 10 F.3d 1547, 1550 (11th Cir.1994). Even if the court determines that the claimant's

---

[23]"Wrong" is the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo,* the court disagrees with the claims administrator's plan interpretation. *See Yochum v. Barnett Banks, Inc.,* 234 F.3d 541 (11th Cir.2000); *see also Marecek v. BellSouth Telecommunications, Inc.* 49 F.3d 702, 705 (explaining a court must decide if the administrator correctly interpreted the plan). *Brown* is the seminal Eleventh Circuit case on the standard by which to review a claims administrator's decision. In *Brown,* the court states "the fiduciary's interpretation first must be 'wrong.' " *Brown,* 898 F.2d at 1566 n. 12. The *Brown* court supports this statement with the following citation and explanatory parenthetical: "*See, e.g., Denton v. First Nat'l Bank of Waco,* 765 F.2d 1295, 1304 (5th Cir.1985) (first step in application of arbitrary and capricious standard is determining legally correct interpretation of disputed plan provision), cited with approval in *Jett v. Blue Cross & Blue Shield,* 890 F.2d 1137, 1139 (11th Cir.1989)." Thus began the Eleventh Circuit's use of the word "wrong." *See Lee v. Blue Cross/Blue Shield,* 10 F.3d 1547, 1551 n. 3 (11th Cir.1994) (stating "*Brown* instructs us to review *de novo* whether the insurer's interpretation of the plan is wrong"); *see also Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield,* 41 F.3d 1476, 1481 (11th Cir.1995).

interpretation is reasonable,[24] the claimant does not necessarily prevail. At first glance it seems odd that a reasonable interpretation would not automatically defeat a wrong interpretation. The reason the claimant's reasonable interpretation does not trump the claims administrator's wrong interpretation is because the plan documents explicitly grant the claims administrator discretion to interpret the plan. *See Brown,* 898 F.2d at 1563 (stressing the importance of allowing an insurance company the benefit of the bargain it made in the insurance contract). We cannot over emphasize the importance of the discretion afforded a claims administrator; the underlying premise of arbitrary and capricious, rather than *de novo,* review is that a court defers to the discretion afforded the claims administrator under the terms of the plan. *See Firestone,* 489 U.S. at 111, 109 S.Ct. at 954 quoting Restatement (Second) of Trusts § 187 (1959) ("[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion").

To find a claims administrator's interpretation arbitrary and capricious, the court must overcome the principle of trust law[25] which states that a trustee's interpretation will not be disturbed if it is reasonable. *See Firestone,* 489 U.S. at 110-11, 109 S.Ct. at 954 (explaining that when a trustee is granted discretion his interpretation will not be disturbed if it is reasonable). Thus, the next step requires the court to determine whether the claims administrator's wrong interpretation is nonetheless reasonable. If the court determines that the claims administrator's wrong interpretation is reasonable, then this wrong but reasonable interpretation is entitled to deference even though the claimant's interpretation is also reasonable.

The claims administrator's interpretation is not necessarily entitled to deference, however, if the claims administrator suffers from a conflict of interest. Therefore, the next step in the analysis requires the court to gauge the self interest of the claims administrator. If no conflict of interest exists, then only arbitrary and capricious review applies and the claims administrator's wrong but reasonable decision will not be found arbitrary and capricious. *Lee,* 10 F.3d at 1550. The steps discussed thus far constitute arbitrary and capricious review and if there is no conflict of interest, the inquiry stops. If a conflict of interest does exist, however, then heightened arbitrary and capricious review applies. In applying heightened arbitrary and

---

[24]When a plan is ambiguous, the principle of *contra proferentem* requires that ambiguities be construed against the drafter of a document; as such, the claimant's interpretation is viewed as correct. *Lee,* 10 F.3d at 1551. In *Lee,* 10 F.3d at 1551 and *Florence Nightingale,* 41 F.3d at 1481 n. 4, this court held that *contra proferentem* applies to ERISA plans.

[25]*See Firestone,* 489 U.S. at 110, 109 S.Ct. at 954 (explaining that trust principles are applicable to ERISA fiduciaries).

capricious review, the court follows the same steps that constitute arbitrary and capricious review, but given the claims administrator's self interest, it continues the inquiry.

Under the heightened arbitrary and capricious standard of review, the burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self interest. *Id.* The claims administrator satisfies this burden by showing that its wrong but reasonable interpretation of the plan benefits the class of participants and beneficiaries. *See Brown,* 898 F.2d at 1568. Even when the administrator satisfies this burden, the claimant may still be successful if he can show by other measures that the administrator's decision was arbitrary and capricious. *See id.* at 1568. If the court finds that the claims administrator fails to show that its plan interpretation benefits the class of participants and beneficiaries, the claims administrator's plan interpretation is not entitled to deference.

## VII.

The crux of EHI's appeal is two-fold. First, EHI contends that the district court improperly used the heightened arbitrary and capricious standard of review. Second, EHI asserts that even if heightened arbitrary and capricious review was appropriate, the district court erred in holding that EHI failed to purge the taint of self interest. We address these concerns in turn.

## A.

To determine the standard by which to review a claims administrator's plan interpretation, a court follows the steps outlined in Part VI. Our application of these steps reveals that heightened arbitrary and capricious review is the correct standard.

## 1.

First, the plan documents grant EHI discretion to interpret disputed terms. The COI states:

> With respect to paying claims for benefits under this Policy, WE [EHI] as administrator for claims determinations and as ERISA claims review fiduciary ... shall have discretionary authority to 1) interpret policy provisions, 2) make decisions regarding eligibility for coverage and benefits, and 3) resolve factual questions relating to coverage benefits.

Given this contractual grant of discretion, *do novo* review is inapplicable and at a minimum, arbitrary and capricious review applies.

## 2.

Next, we determine whether EHI's plan interpretation is wrong. EHI points out that under the Schedule of Benefits in the COI, it is required to pay a specified percentage of the expense of covered medical services and the participant is required to pay the balance of the expense. Crucial to determining whether

EHI's interpretation is wrong is the meaning of the term "expense." EHI emphasizes the common meaning of the term found in Webster's Dictionary, and argues that "expense" is "the amount necessary to obtain covered medical services." According to EHI's interpretation of the plan, the term "expense," as it is used in the COI, includes the discounted fees in the Parkway/MedView contract.

EHI supports its plan interpretation by relying on 29 U.S.C § 1104(a)(1)(D), which states that a plan is to be administered by the fiduciary in accordance with the documents and instruments governing the plan. EHI asserts that the contract between HSI and itself (which is based on the MedView/HSI and the Parkway/MedView contracts) is a document and instrument governing the plan. EHI calls the provider discounts this contract allow EHI to access its "shared savings" program. As such, the scope of 29 U.S.C. § 1104(a)(1)(D) and this series of contracts entitle EHI to interpret "expense" to include the discounted fee Parkway promised in the Parkway/MedView contract.

We find that EHI's interpretation of the plan documents is wrong for two reasons. First, EHI wrongly interprets its contract with Denton. Second, EHI wrongly interprets its rights under the series of contracts linking it to Parkway. We discuss each of these reasons in turn.

a.

First, EHI's plan interpretation is not consonant with the terms of the COI—specifically, EHI's stance on the meaning of the term "expense." In the Schedule of Benefits of the COI, EHI specifically states:

> [b]enefits are payable only if services are considered to be covered expenses and are medically necessary. All covered services [are][sic] payable on a maximum allowable fee basis and are subject to specific conditions, durational limitations and all applicable maximums of this policy.

To understand EHI's duties under the COI, one must ascertain the meaning of "covered expense." The COI defines Covered Expense as:

> (1) A Medically Necessary expense; (2) For the benefits stated in this Certificate; and (3) An Expense Incurred when You are insured for that benefit under this Policy on the date that the Service is rendered.

The definition of Covered Expense leads us to inquire into the meaning of the term "Expense Incurred."

> Expense Incurred means the Maximum Allowable Fee charged for Services which are Medically Necessary to treat the condition. The date Service is rendered is the Expense Incurred date.

This definition in turn necessitates a definition of "Maximum Allowable Fee."

> Maximum Allowable Fee is the lesser of: (1) The fee most often charged in the geographical area where the Service was performed; (2) the fee most often charged by the provider; (3) the fee which is recognized by a prudent person; (4) the fee determined by comparing charges for similar Services to a national data base adjusted to the geographical area where the Services or procedures were performed; or (5) The fee determined by using a national Relative Value Scale (Relative Value Scale means the methodology that values medical procedures and Services relative to each other that

includes, but is not limited to, a scale in terms of difficulty, work, risk, as well as the material and outside costs of providing the Service, as adjusted to the geographic area where the Service or procedures were performed).

The district court found that, given these definitions in EHI's contract with Denton's employer and plan sponsor (Software Builders), the phrase "expense incurred" could not validly be interpreted to mean a charge reduced or discounted through EHI's contract with HSI. *HCA Health Services, Inc. v. Employers Health Ins. Co.,* 22 F.Supp.2d 1390, 1396 (N.D.Ga.1998). The district court reasoned that,

> such a discounted charge does not meet any of the definitions of "Maximum Allowable Fee" included in the contract. Second, the only terms of the contract which speak to negotiated fees are contained within the PPO provisions, and the shared savings discount is in conflict with those provisions.... Additionally, whereas EHI provides the insured with a list of PPO providers so that the insured can make a reasoned choice, the insured never knows who the shared savings providers are and is unable to make a reasoned choice to use a shared savings provider rather than a provider with whom there are no negotiated savings.[26]

*Id.* at 1396.

We agree with this reasoning regarding the plain language of the plan. To support its position that the district court erred in finding that "expense" cannot include the discounted fee at issue in this case, EHI points to the third definition of Maximum Allowable Fee, namely "(3) the fee which is recognized by a prudent person." EHI's Amicus Curiae[27] explain that if EHI paid Parkway an amount 25% higher than Parkway was contractually obligated to accept, then this payment would not be a "fee ... recognized by a prudent person." Not only does this argument erroneously assume that Parkway is obligated to charge Denton the discounted fee, but we disagree that the discounted fee is the fee recognized by a prudent person. Common sense dictates that the fee recognized by a prudent person is the usual and customary fee in the industry.[28] Instead of supporting EHI's interpretation, the language in the COI stating that the Maximum Allowable Fee is the fee recognized by a prudent person further bolsters Parkway's interpretation of "expense." A prudent person would assume that the fee for a service is the reasonable, usual and customary fee. He would not even consider the discounted fee because it only arises out of a specified contractual

---

[26]"Shared savings agreements" is the term of art EHI uses to refer to the contracts, such as its contract with HSI, which allow it to access discounted fees from out-of-network providers.

[27]Amici Curiae for EHI are the American Association of Preferred Provider Organizations and the Health Insurance Association of America. Amicus Curiae for Parkway is the American Medical Association of Georgia.

[28]Unlike the fee common in the industry, a discounted fee is the product of a unique contractual relationship between provider and insurance company.

relationship. The usual and customary fee is the reasonable fee and, as such, is the fee recognized by a prudent person.

b.

Second, we find that EHI's plan interpretation is wrong because it erroneously construes the series of contracts linking it to Parkway. Recall that EHI's plan interpretation is two-fold: first, the series of contracts entitles EHI's plan participants to be charged Parkway's discounted fee and, second, the discounted fee explains the meaning of the term "expense" in EHI's contract with Denton. For the reasons explained above, the term "expense" in the COI cannot be construed to include the discounted fee at issue in this case. Because EHI cannot retroactively modify the meaning of the term "expense" in its contract with Denton, its plan interpretation is wrong. Even if, as a general matter, EHI could use undisclosed, outside agreements not in existence at the time EHI issued its policy to Denton, to explain the meaning of the term "expense," the outside agreements in this case (i.e., the series of contracts linking EHI to Parkway) do not entitle EHI to the discounted fee because Parkway does not receive the benefit of its bargain. Because EHI is not entitled to the discounted fee, it follows that it cannot base the percentage it owes Parkway on the discounted fee. In short, consideration of either component of EHI's plan interpretation reveals that it is wrong.

The terms of the Parkway/MedView contract do not support the proposition that EHI is entitled to base the percentage it owes Parkway on the discounted fee.[29] EHI argues that each contract in the series of

_____

[29]We note that, apart from performing fee collection services and utilization and quality assurance reviews, the consideration in the Parkway/MedView contract that supports Parkway's promise to discount its fees is unclear. We could find that, due to the lack of clear adequate consideration, the Parkway/MedView contract is not valid. This would necessarily mean that EHI is not entitled to Parkway's discounted fee because the "root" contract that allegedly entitled MedView to lease the discount to HSI, which HSI in turn leased to EHI, is unenforceable. We decline to find a contract that has been continually performed since 1994 void for lack of consideration. Instead, we note that while the Parkway/MedView contract does not specifically refer to steerage, given the typical workings of the PPO form of managed care, it is clear to us that Parkway entered the Preferred Hospital Agreement to become a provider in MedView's network. MedView was then to negotiate with third party payors, such as insurance companies, so that Parkway and the other providers in the network would be the "in-network" providers in the insurance company's PPO. Consider Exhibit C to the Parkway/MedView contract. Although there appears to be some discrepancy about when and if Exhibit C was signed, we note that Exhibit C to the Parkway/MedView contract is entitled "Payors." Parkway represents that the Subscribers affiliated with these Payors are entitled to the discounted fees Parkway promised when joining MedView's preferred provider network. Although not referenced in the primary contract, Exhibit C evidences that the purpose of the Parkway/MedView contract was that MedView would form contracts with third party payors that called for the payors to treat MedView's network as preferred providers in return for the providers' discounted fees. It seems that Exhibit C evidences some of the entities with which MedView had established the payor/in-network provider relationship. We will not let the lack of clarity in the Parkway/MedView contract obscure our understanding of the manner in which the managed care industry, specifically PPOs, operates. When read as a whole, it is clear that the Parkway/MedView contract contemplates that MedView would act as a middleman between Parkway and a third party payor

contracts at issue in this case evidences its entitlement to the discounted fee. EHI interprets the first contract in this series, the Parkway/MedView contract, as follows: According to EHI, Parkway's "contract with MedView defined 'third party payor' to include 'any business entity' having a contract with MedView. As a 'business entity' having a contract with MedView, HSI qualified as a payor." Because Parkway knew that MedView could contract with "any business entity" at the time of contract formation, Parkway cannot renege on its promise to discount its fees.

The terms of the Parkway/MedView contract are not the primary issue in the case before us; therefore, we decline to decide whether MedView's leasing contract with HSI is valid. Nonetheless, for the limited purpose of explaining why EHI's plan interpretation is wrong, we note that one of the express purposes of the March 18, 1994 agreement between Parkway and MedView was to coordinate and arrange for the delivery of hospital and physician services to MedView Subscribers. Integral to the contract (and to EHI's argument) are the definitions of the terms Third Party Payor and Subscriber.

The Parkway/MedView contract defines Third Party Payor as "an insurance company, employer, or other business entity which has contracted with MedView to pay for medical services and/or surgical services rendered by participating physicians to MedView Subscribers and Hospital Services rendered by Preferred Hospitals to MedView Subscribers." Instead of citing this complete definition, EHI's definition of Third Party Payor, quoted above, refers only to the phrase "business entity which has contracted with MedView." EHI claims that this excerpt from the definition of Third Party Payor evidences MedView's right to lease its provider list to HSI, which in turn validates HSI's right to lease the list to EHI, which then entitles EHI to be charged the discounted fee. The omissions in EHI's definition of Third Party Payor are not insignificant. Rather, they reveal the true nature of the Parkway/MedView contract, to wit: to pay for medical services rendered to MedView Subscribers. As such, the definition of Third Party Payor, and whether EHI qualifies as a Third Party Payor under the Parkway/MedView contract, necessarily depends on the definition of Subscriber.

Consider that Subscriber means "a person who, by virtue of a binding contract between MedView and any business entity, may obtain medical and/or surgical services of Preferred Hospitals." Denton is not a MedView Subscriber; he did not obtain medical care from Parkway by virtue of a binding contract between

---

(such as an insurance company) and that the third party payor would steer its participants to Parkway in return for Parkway's promise to discount its fees. Without the benefit of steerage there is no reason for Parkway to agree to discount its fees.

MedView and HSI.[30] Similarly, neither HSI nor EHI is a business entity contracting with MedView to pay for medical services rendered by participating physicians to MedView Subscribers. EHI and HSI may be business entities that contracted with MedView,[31] but the purpose of this contract was not "to pay for medical services rendered by ... physicians to MedView Subscribers."[32] Importantly, EHI and MedView never entered into a relationship that would result in EHI's plan participants becoming MedView Subscribers, and this relationship does not arise by virtue of a leasing contract like that peddled by HSI.[33] Thus, insofar as EHI's plan interpretation rests on the contract between MedView and Parkway, it is wrong.

We note in passing that while EHI may interpret the plan in accordance with governing instruments and documents (29 U.S.C. § 1104(a)(1)(D)), we take issue with the notion that the Parkway/MedView contract and the MedView/HSI contract (contracts to which EHI is not even a party) govern the contract between EHI and Software Builders. EHI fails to provide Parkway with the benefit of its bargain. We also dismiss EHI's contention that it is entitled to the benefits of a promise in a contract to which it is not a party and from which it is three times removed.[34] Basically EHI is saying that Parkway's promise to discount its

[30]Given the reasons for these contracts in the managed care industry, we note that a subscriber is a participant in an employee benefit plan administered by an insurance company. When MedView and an insurance company contract for the insurance company to use MedView's network as its preferred providers, the participant may obtain medical services from the preferred providers.

[31]Of course, only HSI and MedView entered into a contractual arrangement. However, because EHI claims that through its contract with HSI it is entitled to a provision of the Parkway/MedView contract, we analyze whether either entity, HSI or EHI, is a Third Party Payor under the Parkway/MedView contract.

[32]The express purpose of the MedView/HSI contract is that MedView will "enter into contractual arrangements with health care providers for the purpose of arranging for the delivery of health care services at a reduced fee, and will provide other services for [HSI].... [HSI] desires to obtain the advantage of the reduced fees available through preferred provider network by 'leasing' MedView's network of providers. 'Leasing' means that [HSI] will perform all repricing functions to adjust fees from charges to contracted rates." Nowhere does the MedView/HSI contract indicate that its purpose is to pay for medical services rendered by physicians to MedView Subscribers.

[33]Although poorly drafted, the Parkway/MedView contract clearly contemplates that MedView would contract with an insurance company and that insurance company's participants would obtain medical services at Parkway and be charged a discounted fee because Parkway would be a preferred provider in the insurance company's plan. The contract's title, Preferred Hospital Agreement, evidences that this is the purpose of the Parkway/MedView contract. Given what is usual and customary in the managed care industry, we cannot imagine that even a poorly represented entity would promise to discount its fees in return for nothing.

[34]In its reply brief, EHI quotes an excerpt from a deposition of Parkway's corporate representative to support its argument that Parkway agrees that the stream of contracts is not material. We find that the thrust of these questions and answers does not necessarily relate to the number of intermediaries so much as to the fact that participants in EHI's plan are not MedView Subscribers. Even if EHI is correct that

fee travels from the Parkway/MedView contract through the MedView/HSI contract through the HSI/EHI contract to the EHI/Software Builders contract to modify the term "expense."  We cannot accept such logic.[35]

### 3.

Next, we consider whether Parkway's interpretation is reasonable.  Parkway argues that no provision in EHI's ERISA plan allows EHI to base the percentage it owes Parkway on a discounted fee.  The PPO provisions of the COI mention discounted fees in the context of explaining that if a participant uses an in-network provider,[36] then his co-payment percentage will be less than if he uses an out-of-network provider.  Since the COI discusses discounted fees only in the context of in-network providers and Parkway is not an in-network provider, Parkway's contention that the plan documents do not permit EHI to discount its charges is sound.  Because the only terms in the COI even suggesting discounted fees are in the PPO provisions and because Parkway is not in EHI's network of preferred providers, EHI may not apply a discount to Parkway's charges.

We concur with the district court that Parkway's interpretation of the plan is reasonable.  In the COI, EHI informs participants (1) that it has negotiated discounted fees with in-network providers and (2) that the participant's co-payment will be less if he uses the services of an in-network provider.  Discounted fees are not mentioned anywhere else in the COI. As such, it can reasonably be inferred from the contractual language

---

Parkway considers the number of intermediaries insignificant (which we doubt), we consider the series of contracts an important factor in our determination that EHI's interpretation of the plan is wrong.

Furthermore, we are not saying that EHI can never contract with an out-of-network provider.  Given, among other factors, that Parkway fails to receive the benefit of its bargain and that plan participants are unaware of the discounts, we question the validity of the stream of contracts at issue *in this case*.  It is important that neither Parkway nor Denton knew of the terms of the HSI/EHI contract.  By informing Denton that it had negotiated discounted fees with in-network providers, thereby raising the inference that it had not negotiated discounted fees with out-of-network providers, such as Parkway, we query whether EHI unilaterally modified its contract with Denton.

[35]We also question EHI's interpretation of the plan because it interprets a provision in its plan a certain way (i.e., "expense" includes the discounted fees of out-of-network providers that we obtain through leasing agreements) and then unilaterally "forces" this provision into the contract between Parkway and Denton.  Parkway charged Denton $3,108.00 for the hernia operation.  According to EHI, Parkway should have reduced this fee by 25% and charged Denton $2,331.00.  EHI essentially uses its contract with HSI to unilaterally modify the contract between Parkway and Denton.  (Note that if Parkway had promised EHI that it would charge EHI's plan participants a discounted fee, then the ability of EHI to demand the discounted fee would be an entirely different matter.)

[36]As explained above, EHI contracted with PHCS as its network of preferred providers.

that at the time of contract formation EHI was not contemplating discounts with out-of-network providers.[37]

### 4.

Having decided that EHI's plan interpretation is wrong and Parkway's interpretation is reasonable, we next determine whether EHI's interpretation is reasonable. Given the complex interrelation of the series of contracts at issue in this case, we assume for the sake of argument that EHI's interpretation is reasonable. Even if EHI's wrong interpretation is reasonable, we cannot afford it the deference attributable to arbitrary and capricious review because EHI suffers from a conflict of interest.[38]

### 5.

We find that EHI acted under a conflict of interest because EHI pays claims out of its own assets.[39]

---

[37]On April 1, 1995, EHI issued insurance to Denton. Approximately two and one half months later, on July 18, 1995, EHI entered into the contract with HSI. As such, Denton and other similarly situated participants were not aware that they would be charged discounted fees by some out-of-network providers.

[38]In a notice of supplemental authority filed pursuant to Eleventh Cir. R. 28-4.6, EHI argues that under *Pegram v. Herdrich,* 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000), its decision to base the percentage it owed Parkway on the discounted fee rather than on the usual and customary fee was a decision implicating plan design and, therefore, not a fiduciary act that may give rise to a conflict of interest. We disagree. *Pegram* is a breach of fiduciary duty case and not a case involving a denial of benefits due under a plan. The plaintiff in *Pegram* argued that the HMO breached its fiduciary duty to the patient by providing incentives for its physicians to limit medical care and procedures. Specifically at issue in *Pegram* was whether an HMO should be treated as a fiduciary under ERISA section 1109 when it makes mixed eligibility and treatment decisions. The Court described eligibility decisions as those involving "the plan's coverage of a particular condition or medical procedure for its treatment. 'Treatment decisions,' by contrast, are choices about how to go about diagnosing and treating a patient's condition: ... what is the appropriate medical response?" *Id.* at 120 S.Ct. at 2154. Mixed decisions are those in which determination of whether a benefit plan covers a particular condition or procedure is inextricably mixed with determination of the appropriate treatment. The Court reasoned that mixed eligibility and treatment decisions made by an HMO acting through its physicians are not fiduciary acts; therefore, the plaintiff failed to state a claim for breach of fiduciary duty under ERISA. *See id.* EHI misreads *Pegram* when it states:

> when EHI was presented the bill for services rendered by [Parkway] to an insured, the decisions EHI made involved both plan eligibility, i.e., whether to cover the treatment, and plan content, i.e., how to pay for the treatment in light of its cost containment measures. In light of *Pegram,* EHI's decision to pay for the treatment in accordance with the contractual discount was not a "fiduciary" act that might give rise to a conflict of interest.

Because EHI's alleged denial of benefits does not constitute the type of mixed eligibility and treatment decision at issue in *Pegram,* we decline to find, based on *Pegram,* that EHI's interpretation of its plan was not a fiduciary act.

[39]EHI contends "no true conflict [exists] *between [itself] and Denton.* Denton and EHI both benefitted from the discount. Consequently, the rationale regarding 'conflicts' of *Brown* and its progeny is inapplicable" (emphasis added). The thrust of EHI's argument is that because there is no conflict between EHI and Denton, no conflict of interest exists and therefore there is no need to apply the heightened

In *Brown v. Blue Cross & Blue Shield,* 898 F.2d at 1556, 1561-62, we explained that "because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business ... [a] strong conflict of interest [exists] when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims.... The inherent conflict between the fiduciary role and the profit-making objective of an insurance company make a highly deferential standard of review inappropriate." Therefore, we cannot stop our inquiry at mere arbitrary and capricious review. Contrary to EHI's assertion, the district court did not err in applying the heightened arbitrary and capricious standards of review. Because we hold that heightened arbitrary and capricious review is the appropriate standard, we turn to EHI's other contention, namely: when applying heightened arbitrary and capricious review, the district court erred in finding that EHI failed to purge the taint of self interest. In addressing EHI's argument, we continue our application of the steps that constitute heightened arbitrary and capricious review.

B.

Under the heightened arbitrary and capricious standard, the burden shifts to EHI to demonstrate that its interpretation of the plan was not tainted by self interest. A conflicted fiduciary can purge the taint of self interest by proving that its wrong but reasonable interpretation of the plan was "calculated to maximize benefits to participants in a cost-efficient manner." *Lee v. Blue Cross/Blue Shield,* 10 F.3d 1547, 1552 (11th Cir.1994). Although EHI's plan interpretation is wrong for either of the reasons discussed Part VII.A.2.a-b, we could still hold EHI's interpretation is not arbitrary and capricious if it results in a benefit to Denton and other beneficiaries. According to EHI, its interpretation benefits Denton because his co-payment was limited to 20% of the discounted fee rather than 20% of the usual and customary fee.[40] In order to determine whether this benefit to Denton and other participants purges the taint of self interest, we consider the consequences that follow from Parkway's and EHI's plan interpretations when applied to the following hypothetical

arbitrary and capricious standard of review to EHI's plan interpretation. *Brown* involves a claims administrator's internal, i.e., inherent, conflict of interest. Because *Brown* involves a claims administrator's internal conflict and EHI refers to the absence of an external conflict, we agree with EHI that *Brown* is inapposite regarding such absence of an external conflict. The focus of the conflict of interest inquiry, however, is whether the claims administrator is internally conflicted; *Brown,* therefore, controls.

[40]According to EHI, not all participants and beneficiaries need to receive a benefit in every case, so long as the plan interpretation was calculated to confer a benefit upon them. Because we find that EHI's interpretation failed to benefit even Denton (*see* Part VII.B.3.a-b and 4 *supra* ), we need not decide the scope of the benefit a conflicted fiduciary must show in order to purge the taint of self interest.

scenario. The facts in this hypothetical scenario are based on a simplified version of the facts of this case.

1.

Assume there are only three health insurance carriers in a metropolitan area: Insurance Company A, Insurance Company B, and Insurance Company C. Each of these insurance companies has contracted with a different PPO to serve as the in-network providers under each company's respective health plan.[41] For instance, Insurance Company A entered a contract with PPO A by which Insurance Company A promises to steer its plan participants to PPO A providers and PPO A providers agree to discount the fees they will charge Insurance Company A's participants. Insurance Companies B and C have identical agreements with PPOs B and C, respectively, exchanging steerage of plan participants for discounted medical services.[42]

The insurance companies steer plan participants to in-network providers in their respective PPOs through economic incentives.[43] A typical arrangement might operate as follows. If a participant (Participant A) in Insurance Company A's plan utilizes the services of a provider in PPO A, i.e., an in-network provider, then Insurance Company A will pay 90% of the provider's fee for medical service and Participant A will pay 10% of the fee. If Participant A utilizes the services of a provider not in PPO A, i.e., an out-of-network provider, then Insurance Company A will pay 80% of the provider's fee for medical services and Participant A will pay 20% of the fee. By requiring Participant A to pay a larger percentage (20%) of the fee for medical services obtained from an out-of-network provider than Participant A would have to pay if he utilized the services of an in-network provider (10%), Insurance Company A "steers" participants to providers in PPO

---

[41] We note that, like the facts of this case, the relationship between each Insurance Company and each PPO network could have been facilitated through a middleman, like MedView.

[42] Apparently, it is accepted in the industry that "the requirement of steerage should be inferred in provider contracts." Michael L. Ile, *Position of the American Medical Association on Silent PPOs,* Health Care Innovations 40 (Sept./Oct.1995). While noting that steerage seems to be at the heart of all PPO arrangements, we need not decide whether the requirement of steerage is *per se* implied in contracts between insurance companies and providers in the PPO industry. As discussed *supra* Part VII.A.2.b, steerage is implicit in the contract between MedView and Parkway.

[43] Steerage means actively encouraging plan participants to seek the services of the providers in the PPO by such means as financial incentives. Financial incentives include reduced co-payment and deductible amounts when the participant uses a preferred provider. Steerage also occurs through communication efforts such as providing participants with a list of preferred providers, a hotline to inform and refer participants to preferred providers, and issuing identification cards designed to inform providers that a patient is a participant eligible for the PPO discount.

A by making those providers more financially attractive.[44] In return for this steerage, the providers in PPO A discount their usual and customary fees for medical services. Providers in PPO A are willing to charge Insurance Company A a discounted rate because the money they "lose" in discounting their fees is offset by the increased volume of patients they will serve as a result of Insurance Company A's steering efforts. For purposes of this hypothetical, assume that the Insurance Company B/Participant B contract and the Insurance Company C/Participant C contract use similar economic incentives to steer participants to providers in PPOs B and C, respectively. Thus, in return for this steerage, the providers in PPO B promise Insurance Company B they will discount their usual and customary fee for medical services. PPO C and Insurance Company C have the same arrangement. There are no other insurance companies or PPOs in this hypothetical metropolitan area.

Given this background, suppose Participant A breaks his arm. It is undisputed that in this metropolitan area, the usual and customary fee for setting a broken arm is $1000.00. Providers in PPO A agree that because Insurance Company A steers participants to them, they will only charge $800.00 for setting a broken arm rather than the customary $1000.00. As such, if Participant A's arm is set by a provider in PPO A, then Insurance Company A will pay 90% of the $800.00 fee ($720.00) and Participant A will pay 10% of the $800.00 fee ($80.00).

However, if Participant A chooses to have his broken arm set by an out-of-network provider, i.e., a provider in PPO B or PPO C,[45] Participant A expects that he will pay 20% of the fee for medical service and that Insurance Company A will pay 80% of the fee. Although the percentages are not disputed, at issue in this hypothetical and in this case is: what is the correct fee for medical service?

2.

Under Parkway's interpretation of the plan as applied to this hypothetical scenario, the fee for setting the broken arm is $1000.00. As previously noted, it is undisputed that $1000.00 is the usual and customary

---

[44]We note that EHI's COI contains a subsection labeled *Reasons to Use a PPO Provider.* The COI lists the following reasons: "1. We [EHI] negotiate fees for medical services. The negotiated fees lower costs to You [Participants] when You use ... providers in the PPO. 2. In addition, You may receive a better benefit and Your Out-Of-Pocket expenses will be minimized. 3. You will have a wide variety of selected ... providers in the PPO to help YOU with Your medical care needs. In order to avoid reduced benefit payments, obtain Your medical care from Preferred Providers whenever possible. However, the choice is Yours."

[45]Recall that for purposes of this hypothetical there are only three insurance companies, only three PPOs, and all providers in the metropolitan area are members of one and only one of the PPOs.

fee for setting a broken arm. While the provider in PPO B promised Insurance Company B that it would charge Insurance Company B $800.00 for setting a broken arm, it did so only because (1) its loss from receiving this discounted amount would be offset by the increased volume of patients PPO B providers would service given Insurance Company B's steerage efforts and (2) it can subsidize these discounted fees by continuing to charge its usual and customary fee ($1000.00) when treating patients who are not participants in Insurance Company B's plan.

Parkway points out that the PPO B provider never contracted with Insurance Company A. Further, the PPO B provider made the promise to discount its fees in reliance on Insurance Company B's promise to steer plan participants to PPO B providers. According to Parkway, by claiming that it is entitled to the discounted fee of $800.00, Insurance Company A is availing itself of the PPO B provider's promise to Insurance Company B without giving the PPO B provider the benefit it expected in return for its promise—steerage.[46] By claiming it is entitled to PPO B's discounted fee, Insurance Company A ignores the basic tenet of contract law that contracts are premised on a bargained for exchange. This basic tenet of contract law is violated when, by virtue of a brokering agreement, Insurance Company A uses the PPO B provider's discounted fee but does not give the PPO B provider the benefit it expected in return, namely, steerage.

Assuming Parkway's interpretation of the plan is correct, the fee remains $1000.00, the usual and customary fee for setting a broken arm. Participant A pays 20% of the fee, or $200.00 and Insurance Company A pays 80% of the fee, or $800.00. Furthermore, Participant A receives the level of service he expects from a provider to whom he is paying full price. In essence, this interpretation maintains both of Participant A's contractual expectations: (1) he expected to pay 20% of an out-of-network provider's usual and customary fee and (2) he expected to receive the level of service consonant with this fee.[47]

---

[46]EHI contends that the PPO B provider receives a benefit in exchange for the discounted fee, namely, expedited payment of its fee. We do not dispute that expedited payment benefits the provider. Nor do we suggest that this was not a benefit considered in the contracts between PPO B, its providers, and Insurance Company B or, for that matter, between MedView and Parkway. Nonetheless, even if a provider receives expedited payment, he is still deprived of the benefit of his bargain when his expectation of steerage is not satisfied.

[47]Our analysis is based on the assumption that all parties to this hypothetical are motivated primarily by economic self interest. Simply put, economic principles dictate that the more money a person pays for something, the more he values it and the more he expects from it. As discussed more fully *infra* Part VII.B.3.b, the sheer act of paying a premium to have an option to receive medical care out-of-network and have a percentage of costs covered means (1) that the participant values this choice enough to pay for it and (2) that the participant expects more from out-of-network care than from less expensive, in-network

3.

Under EHI's plan interpretation, Participant A's fee for medical service obtained from the provider in PPO B should not be $1000.00 but $800.00 (the discounted fee PPO B providers agreed to charge Insurance Company B in exchange for Insurance Company B steering its participants to PPO B providers). If the fee is $800.00, and Insurance Company A only has to pay 80% of an out-of-network provider's fee for medical service, then Insurance Company A pays $640.00. By choosing to obtain medical service from an out-of-network provider, Participant A is responsible for 20% of the fee for medical service, $160.00. If, despite that EHI's interpretation is wrong, it nonetheless benefits Denton and other participants, then EHI has purged the taint of self interest. We previously determined that EHI's plan interpretation is wrong for two reasons, *see supra* Part VII.A.2.a-b. We thus reevaluate each of the proffered reasons for its wrong interpretation and gauge whether, despite either reason, the plan interpretation results in a benefit to Denton and other like plan participants.

We first analyze EHI's interpretation from the view that it's interpretation is wrong because the series of contracts does not entitle EHI to the discounted fee. We then analyze the interpretation from the view that it is wrong because EHI cannot modify the meaning of the term "expense" in its contract with Denton. If we find a benefit to Denton and other participants, then EHI's wrong but reasonable plan interpretation is entitled to deference. If we find EHI's interpretation does not inure a benefit to Denton and other plan participants, we may conclude that the interpretation is arbitrary and capricious.

a.

Assuming EHI's interpretation is wrong because Insurance Company A is not entitled to the discounted fee PPO B providers promised to Insurance Company B, we consider whether EHI's wrong but reasonable interpretation is entitled to deference because it benefits Denton and other participants. If Insurance Company A is not entitled to the discounted fee PPO B providers promised to Insurance Company B, then the cost of medical services is just the usual and customary fee for setting a broken arm, i.e., $1000.00. By only paying $640.00 of the PPO B provider's bill, Insurance Company A leaves Participant A on the hook for the remainder of the bill, $360.00.[48] While Participant A expects to pay more for

care.

[48]In its reply brief, EHI assures the court that it "has never taken the position that it would abandon Denton and leave him to pay the entire amount of the discount." Despite EHI's assertion that it would never "abandon Denton," the fact of the matter is that Denton is liable for Parkway's bill. He is obligated

out-of-network medical service, he only expected to pay 20% of an out-of-network provider's fee. Given that the usual and customary fee is $1000.00, Participant A expects he will pay $200.00 and that Insurance Company A will pay $800.00. However, if Insurance Company A only pays 80% of the $800.00 discounted fee, i.e., $640.00, Participant A is responsible for a co-payment of 20% of the discounted fee ($160.00) plus the remainder of the bill ($200.00) when he is balance billed by the PPO B provider. Thus, Insurance Company A's interpretation of the plan results in Participant A paying $360.00 rather than $200.00 for out-of-network medical care.

This unexpected increase in cost will deter Participant A from seeking out-of-network medical care. The primary reason managed care plan participants choose PPOs over less expensive forms of managed care is that PPOs allow a participant the flexibility to seek out-of-network treatment for a small increase in the percentage of his co-payment.[49] HMOs, in contrast, typically provide no coverage for out-of-network care. Because Insurance Company A's interpretation of the plan deters Participant A from utilizing the out-of-network care option, Participant A loses some of the benefit he expected to receive when he paid his premium. If out-of-network care was not going to be a financially viable option, Participant A might have chosen health care coverage from an HMO rather than a PPO.

Indeed, the ability to receive out-of-network care is the *sine qua non* of a PPO. Although the option of having out-of-network medical care covered by insurance will cost the participant more money, participants who choose PPOs over HMOs deem this burden outweighed by the benefit of the flexibility to choose one's health care provider. By making this option more financially onerous than the participant originally (and rightfully) expected when he entered the PPO arrangement, EHI deters the participant—in fact, all plan participants—from seeking out-of-network care. In so doing, EHI effectively limits participants to in-network providers. Therefore, at best, EHI is depriving participants of their bona fide contractual expectations. At worst, EHI is siphoning money from participants and splitting the proceeds of this ill-gotten

---

to pay Parkway whatever amount EHI does not pay until Parkway is made financially whole. In short, insofar as Denton is analogous to Participant A, he is financially disadvantaged because he is responsible for the remainder of the bill.

[49]A PPO covers the cost of medical care obtained from an out-of-network provider while an HMO does not. This flexibility is not without a price; the increased cost to the insurance company of a participant obtaining out-of-network care is reflected in the participant's premium payment, which is generally higher than an HMO premium payment.

gain between itself and HSI.[50]

It is plain that EHI's wrong interpretation (i.e., wrong because EHI is not entitled to Parkway's discounted fee) is not entitled to deference because it deprives participants of their contractual expectation. As such, EHI has not purged the taint of self interest. We find, therefore, that its plan interpretation is arbitrary and capricious. EHI's success on appeal, however, depends on whether, in light of the other reason its plan interpretation is wrong, we find that the interpretation benefits Denton and other participants. Consequently, we now consider whether EHI's interpretation continues to be arbitrary and capricious even if EHI is correct that Insurance Company A is entitled to the discounted fee, but incorrect about how this discount impacts Insurance Company A's contract with Participant A.

b.

According to EHI, when Participant A received medical service from Provider B, Provider B should have charged Participant A $800.00 based on a contract that Insurance Company A made through a series of middlemen. EHI deems it irrelevant (1) that Provider B never knew its promise to discount its usual and customary fee was leased to Insurance Company A and (2) that Provider B does not get steerage in return for this promise. Because both Participant A[51] and Provider B are unaware that Provider B is obligated to charge a discounted fee, they agree that Participant A will pay $1000.00 and Provider B will set Participant A's broken arm with a level of service consonant with this fee. Provider B bills Insurance Company A on Participant A's behalf demanding 80% of $1000.00 ($800.00) from Insurance Company A and 20% ($200.00) from Participant A. Assuming EHI's plan interpretation as correct—that the series of contracts entitles Insurance Company A to the discounted fee—the correct total fee for setting Participant A's broken arm is $800.00 and not $1000.00. Therefore, Insurance Company A owes Provider B 80% of $800.00 ($640.00) and Participant A owes Provider B 20% of $800.00 ($160.00). At first glance it seems that Participant A

---

[50]It concerns us that while participants are deterred from exercising their contractual right to obtain out-of-network medical care, brokers such as HSI are profiting. EHI pays HSI a fee equal to twenty percent (20%) of the discount obtained on each provider bill. For instance, if Parkway's bill for setting a broken arm is $1000.00, yet EHI and HSI recalculate the bill at $800.00, then EHI pays HSI 20% of $200.00 ($40.00). In essence, participants pay more (in the form of premium payments) and providers receive less than the usual and customary fee for services. Meanwhile, EHI collects premium payments which reflect its obligation to pay for out-of-network care while simultaneously refusing to pay the full fee for such care when its obligation arises. Then, EHI pays HSI a percentage of its savings and pockets the remainder.

[51]It bears repeating that by informing Denton that it had negotiated discounted fees with in-network providers, EHI implied that it had not negotiated discounted fees with out-of-network providers.

benefits from this arrangement because he received the level of service he expected from an out-of-network provider yet only had to pay 20% of a reduced fee rather than 20% of the usual and customary fee.

However, our analysis reveals that Participant A does not benefit in the long run. Consider that after struggling with the hassle of determining and collecting its fee, Provider B is now aware that he is only going to receive $800.00 when setting the broken arms of participants in Insurance Company A's plan.[52] Financially, Provider B is in no different a position than Provider A, Insurance Company A's in-network provider. Like Provider A, Provider B is now obligated to charge Insurance Company A's plan participants a discounted fee. Unlike Provider A, however, Provider B does not get the benefit of steerage from Insurance Company A. Also unlike Provider A, Provider B collects $640 (80% of $800) from Insurance Company A while Provider A collects $720.00 (90% of $800.00). In comparison to Provider A, then, Provider B is burdened with collecting a higher percentage of his fee from an individual participant, who is invariably a payor less financially secure and able than an insurance company.

Consideration of these effects of EHI's interpretation on Provider B reveals that the interpretation deleteriously impacts Participant A and others like him. When Participant A breaks his other arm and returns to Provider B because he was pleased with the level of service he previously received, Provider B is unable to provide Participant A with the same level of service because he receives less compensation. The entire purpose of a PPO rather than an HMO is to afford participants the choice to receive out-of-network medical care. PPO Participants know their medical care will be less expensive if they receive such care from an in-network provider. They choose, nonetheless, to pay a higher premium for the freedom to have their medical expenses covered when they receive medical care elsewhere. A participant presumably believes the level of service he receives outside the network will be different from the level of service he receives inside the network; this is why he pays for the option of going outside the network.[53] Implicit in the belief that the level of medical service differs outside the network is the participant's understanding that this level of service will cost more than in-network medical care. The participant's act of paying for this choice is evidence that participants value the ability to receive medical care outside the network. Presumably, this value is a

---

[52]From this point in our analysis, we assume that all parties—insurance companies, providers, and participants—are apprised of all relevant facts.

[53]Because it is impossible to account for all possible altruistic or subjective motivations, this analysis necessarily presumes that the actors in this hypothetical scenario (insurance companies, providers, and participants) are motivated and act in a way consonant with their own economic self interest. As such, we analyze this problem through the objective means available to us, namely—economic analysis.

different, if not better, level of medical service. We have no doubt this is a participant's contractual expectation when he opts for a PPO health insurance policy.

The results of EHI's plan interpretation crash head on into a participant's rightful and understandable expectation. When Provider B knows that he will be paid less for setting Participant A's arm, he will be unable to provide the same level of service.[54] Participant A chose to receive medical care from Provider B because he thought he would receive a level of service consonant with the higher fee he expects the out-of-network provider to be paid. If Participant A wanted a level of service consonant with a discounted fee, he would get his broken arm set by an in-network provider. The ultimate result of EHI's plan interpretation is that participants receive a level of service consonant with a discounted fee regardless of whether they receive their medical care from an in-network or out-of-network provider. But for the co-payment differential, there is little difference between in and out-of-network providers. Because such an interpretation works to deprive participants of their contractual expectation upon entering a PPO, EHI has not purged the taint of self interest. Accordingly, we hold that EHI's plan interpretation is arbitrary and capricious.[55]

4.

Not only does EHI's plan interpretation deleteriously impact current Participant A's contractual expectations, if followed through to its natural conclusion, EHI's plan interpretation could alter the rights and obligations of future participants and providers. Whether the Parkway/MedView, MedView/HSI, HSI/EHI

---

[54]We reiterate that our analysis presumes that all parties act out of economic self interest. Given that economic principles, not subjective motivations, underlie our analysis, we note that when a provider's fees are reduced yet overhead and other costs of doing business remain constant, something has to give. Of course we are not intimating that, regarding quality of outcomes, a provider will purposely provide less or worse medical care. We are saying that the economic realities of this scenario mean that something has to give, i.e., the level of service. The provider will be forced to take on more patients to offset the reduction in its fee; more patients may result in increased waiting time. Another way the provider can compensate for accepting lower fees is to cut the salaries of his staff or hire fewer staff. Lower salaries may mean a less educated or experienced staff, both of which would impact the level of service a patient receives. Likewise, fewer staff necessarily means there will be less personnel available to attend to the patient; this too impacts the level of service a patient receives. As such, our assertion that the level of service Provider B is able to deliver may differ when he is paid a discounted fee is based simply on economic principles, not on a judgment about the provider's skill or integrity.

[55]Our holding should not be read to mean that payors, such as insurance companies, can never contract with out-of-network providers for reduced fees. Instead, we note that at the time of contract formation between EHI and Software Builders, EHI had yet to contract with HSI. Further, EHI represented to Denton that it only had reduced fee arrangements with its in-network providers, i.e., PHCS's providers. Finally, EHI never informed Denton that it had negotiated reduced fees with out-of-network providers.

series of contracts entitles EHI to the discount or not, Participant A has, in effect, lost the benefit of seeking and receiving out-of-network care. Under either of the reasons we determined that EHI's plan interpretation is wrong, Participant A is likely to demand lower premiums to compensate for the loss of this justified and bargained for contractual expectation. If Participant A and other similarly situated participants succeed in securing lower premiums, then Insurance Company A will have less income. Because Insurance Company A has less income, it will demand larger discounts from providers in PPO A, thereby driving down the fees of in-network providers. Because the level of service participants receive remains consonant with the amount of money providers receive, this reduction in fees will impact the level of service enjoyed by Participant A and others like him. If Insurance Companies B and C interpret their plans to allow undisclosed discounts with out-of-network providers, they too may suffer a participant backlash which in turn may provoke Insurance Companies B and C to demand lower fees from providers in PPOs B and C, respectively. The downward spiraling of the level of service would repeat itself as the providers in PPOs B and C adjust the level of service they provide to reflect their reduced compensation.

Ironically, when a participant in a traditional PPO arrangement is not satisfied with his in-network care, he may seek medical care from an out-of-network provider. For instance, in our hypothetical scenario, Insurance Company A continues to cover the costs of Participant A's medical care when he obtains services from an out-of-network provider. Given the closed universe of our hypothetical scenario, the out-of-network providers available to Participant A would be those providers in PPO B or PPO C. By virtue of undisclosed contracts with a series of middlemen, Insurance Company A can base the percentage it owes the PPO B or C provider on the discounted fee the PPO B or C provider promised Insurance Company B or C rather than on the usual and customary fee. The fee the PPO B or C provider promised to Insurance Company B or C reflects the downward spiraling of provider fees spurred by participants' demand for lower premiums. Not only are the PPO B and C providers having to further discount their fees to remain in-network providers for Insurance Companies B and C, respectively, but due to the effect of agreements like the EHI/HSI contract and the HSI/MedView contract, PPO B and C providers no longer offset this loss by the usual and customary fees they receive when they treat patients who are not participants in Insurance Companies B and C's plans.[56]

---

[56]Recall that the provider has two primary means for offsetting the loss it incurs by charging Insurance Company B a discounted fee: (1) the high volume of patients it treats due to Insurance Company B's steerage efforts and (2) receiving its usual and customary fee when treating patients who are not participants in Insurance Company B's plan.

Importantly, it follows that this effect on providers will negatively impact participants. Consider that the level of service Participant A receives from an in-network provider reflects the further discounting of fees demanded by Insurance Company A to offset its lower premiums. Worse still, the level of service Participant A receives out-of-network is also diminished as providers in PPOs B and C adjust for the failure to receive their usual and customary fee when treating Insurance Company A's participants. When followed to its natural conclusion, EHI's plan interpretation in effect turns a discounted fee negotiated between a specific provider and specific insurance company into the usual and customary fee for the entire medical services industry. Because the level of service participants receive is directly related to this reduction in fees, participants' expectations continue to be unfulfilled.

As the above hypothetical scenario demonstrates, participants' contractual expectations are not satisfied as a result of EHI's plan interpretation. Because EHI's interpretation deprives plan participants of their contractual expectations, we find that EHI's plan interpretation is arbitrary and capricious. The judgment of the district court is, therefore, AFFIRMED.